Good morning. May it please the court, Joseph S. Porta on behalf of the petitioners. I would like to reserve three minutes. Watch your clock, okay? Thank you, Judge. Good morning. This case is a denial of an asylum case by the Board of Immigration Appeals. It's actually an affirmance without opinion, so the scope of review for this court is whether the IJ's adverse credibility determination is supported by substantial evidence. The IJ made no other findings in this case, including not considering the petitioner's convention against torture claims. Basically, the IJ denied the case based upon purported inconsistencies. There were five that he cited, the first of which is a hospital verification letter, quote-unquote hospital verification letter provided by the petitioner, that states that he was, that was written by a doctor that had treated him at his home. At all points in testimony, the Respondent had testified that he was not allowed to tell anybody about his detention, that he was treated solely at his house, and that his wife, who is a nurse and a doctor, had treated him. Now, this letter was provided to the court and — Do you know if this doctor worked at that hospital? Pardon me? Do we know if the doctor worked at the hospital? The doctor was a friend of the wife's. The wife was a nurse. Yes, Your Honor. Your Honor, there is some indication in the record that the doctor did work, that he was a surgeon at that hospital. I believe that there's just not enough information and no foundation to state that the letter on its own terms means that he was actually hospitalized. Well, that's what the letter says. So that's all the IJ had to work with and ask them about it, and they can't provide any kind of a response. So it's very troubling. This is what your client provided to the IJ. It says he was hospitalized. That has a particular meaning in English, and it's inconsistent with what they testified otherwise. Do you know what hospitalized means in Armenian? No, I don't, Your Honor. I don't even know if — what your client said was, I was treated at home. Maybe it's a misinterpretation. Maybe it's the wrong translation. I don't know. So he's looking at the translation, saying maybe hospitalization is a wrong word for the interpretation of the letter. We don't really know if this letter actually says hospitalization or if your client was testifying correctly that it was a misinterpretation. The record is unclear, Your Honor, and for that reason, I would suggest that the IJ's conclusion is based upon speculation. I note that in the IJ in determining this, I do understand that the letter says the word hospitalized. However, he was treated at home. It's a form of hospitalization to be at home, to be in bed rest, to have IVs with you. It's not necessarily means that he was at this precise hospital, nor does the letter concede that to any effect. Counsel, do we have the original in the record? The original? The Armenian? Yes. I believe it's page 535. It's immediately after, Judge. Okay. That's the one that's handwritten. I couldn't tell what that was. Correct. So it does not bear — it appears then it does not bear — does it have an official seal on it? There's a seal, I believe, about three-quarters of the way down. It's circular. Yeah, down at the bottom on the right-hand side. Right there. 535? Right. And then if you look at the corresponding translation, it says, Treating Dr. A.P. Khambarian, which I would imagine — Wait a minute. Okay. On page 535, I have something that appears to be handwritten on page 535. Correct, Judge. If you look at the bottom, towards the bottom right-hand corner, on top of the last line of text, there's a circular seal. Okay. I don't have a circular seal. I have something, though, that appears to look like a big A, and the last letter is an F. Correct. Okay. I don't have a seal there. Mine reflects a seal. Mine has several generations. Oh, yeah. Okay. And the upper left-hand corner, again, my copy is very, very difficult to read. That appears, then, to make this official letterhead. Correct. It looks like a stamp that was affixed to a piece of paper that is indicating that it's hospital letterhead, prepared by the doctor, who was a friend who basically clandestinely treated the petitioner at his home. Part of the reasons that the I.J. is finding that this is not believable is because the petitioner had an I.V. given to him at his house. Another one of the reasons cited by the I.J. is that the petitioner had local anesthesia, and according to the I.J., who is not a medical expert, these type of treatments cannot be rendered to someone in their home, which is baffling, considering that I've had relatives that are sitting at home with I.V.s and have bed rest and a hospice nurse. I do understand. Yeah, so let me just say, the odd thing to me about this is there seemed to be a total disconnect between the I.J. and Hyke and Marguerite, because they didn't, from their testimony, they didn't seem to think that the document they submitted was inconsistent with the story that they were treated at home. And first of all, if it was inconsistent with that story, why would they have submitted it? And secondly, when they're testifying, they're saying, no, this is the wrong translation, because they're both emphatic that he was treated at home. And then there's testimony that in Armenia, people don't want to be in the hospital. They prefer to be treated at home. Correct. And moreover, Your Honor, the petitioner also testified that he was not allowed to seek medical treatment, that that was part of the treatment. Who would have forbidden him from seeking medical treatment? The military officials that beat him specifically told him that he was not to seek medical attention, that he was to stay at home. And that is what prompted him to not go to the hospital. His wife calls his, her friend, the doctor. Correct. Correct. So there's an indication in the record that the petitioner was prevented by the military, by the government officials that inflicted this harm upon him from even going to the hospital. Prevented in the sense that he felt threatened if he went to the hospital. She testifies that ordinarily when you have somebody that would come in like this, that you would, that the hospital would notify the police. No. Actually, one step further, he was specifically told while he was getting beat that he should not be going to the hospital. It was not an assumption on the part of the petitioner. It was actually a statement that was made by the individuals that inflicted the harm, that he should not be going to the hospital. Now, the petitioner, the petitioner did submit that letter, and I do understand that it is an ambiguity at worst, but I don't believe that it is an inconsistency. And since it is not an inconsistency, it's an ambiguity at worst, I don't believe it has substantial evidence. Moving on to some of the other points raised by the I.J., the I.J. found the account of the journalist incoherent. I don't believe that this is either based on the record. I believe this is based more on the I.J.'s misinterpretation of the testimony. The petitioner testified, I.J., that is, that the plant, the nuclear plant that he was working at, had closed down because of some problems. And after it opened, it had gained some attention based upon the fact that people were worried, especially after Chernobyl, and that some journalists were coming in to basically investigate and write some reports. He clearly tried to state in his testimony that it was the, pardon me, I was looking at the clock. Do you want to say, do you want to make your last, that point on the journalist and then save some time for rebuttal? Sure. Basically, the last point on the journalist I would like to make is basically that the journalist, the I.J. cut off testimony. He was trying to give a specific explanation, a technical explanation of what was transpiring with the journalist's interview. And the I.J. basically prevented him from doing that at that point and said, no, just kind of keep it simple. And at that point, it was difficult for the petitioner to discuss. Counsel, did he provide the story that the journalist published? No. And there's evidence in the record that basically he was never shown the story that was published. He was only told by the military officials what was published, and we're not even sure whether the petitioner knew what the military officials were saying were accurate. The bottom line is that the military, he had stated one thing which was truthful, that there were some problems with the plant, that they had been rectified. The journalist basically hyperbolized the statements to make it seem as if the plant, something was going on. This is now, since we don't have the story itself, all we have is that the police telling him or the officials telling the petitioner that the journalist said X, which was different from what he told him. Correct. We're operating about third-hand hearsay here, aren't we? Yes, Judge, but hearsay is a different thing. I understand the position. I just want to make sure that that's why I asked if the story was in the record. And it's not. We don't know what the journalist actually wrote. We only know what the officials told him. No, and in further explanation, the journalist apparently was foreign and he was speaking Russian, so maybe the petitioner was not entitled to see that publication since it might have come out in another country. But, again, we haven't made any effort to try and find that story since he came to the United States. Whether an effort has been made, I don't know. What I do know is that the story itself is not in the record. I'd like to reserve the remainder of my time. Thank you, counsel. May it please the Court. My name is Manning Evans. I represent the government. If I could respond briefly to a couple of questions raised by the Court and comments share some comments about counsel's statements. I just note that the IJ did address the Catt claims in this case, and I would direct the Court to pages 38, 53, and 455 of the record. Also, I think it is clear in this case that we do know what hospitalized means, and I would direct the Court to pages 131, 32 of the record. At that point, the petitioner claimed, the lead petitioner, the husband and son, I'm sorry, the husband and father. He claimed that he had been hospitalized after he was at Chernobyl, and he talked about staying at the University of Radiology. And the immigration judge confronted him and said, well, you said you're hospitalized in your declaration. Do we all know what hospitalized means here? And the petitioner said yes. But isn't that consistent with him saying that the translation, which uses the word hospitalized when it's describing the meaning of the handwritten letter, you're interrupting me again. You did this yesterday. My question is, if he knew the meaning of the word hospitalized, and that's your argument, right? That's your argument? And so he says the translation that uses the word hospitalized must be an incorrect translation because he was treated at home. Well, Your Honor, previously he said that he was treated at the University of Radiology. And my point is that it's clear he knows that hospitalization is not treated at home. Right. And he says that. And that's why he's saying to the immigration judge, insisting, and his wife is insisting, that is a wrong translation because I was treated at home. And he obviously, I agree with you. You know, what you're saying is exactly true. He was hospitalized after Chernobyl, as well as many other people. And the Russian government obviously was very sensitive about the nuclear meltdown in Chernobyl, which in a way is further support for his claim. We have evidence in the record, for example, that he was fired for giving information to the journalist. That's his employment record. What do you make of that? Well, Your Honor, the employment record actually says that he resigned. And I believe that his testimony was that he simply asked for sick leave and then later decided that he would not go back. So I think he was actually inconsistent on that point, although the immigration judge and the board did not rely on that particular point.  Yes, Your Honor. How does the doctor's letter enhance his claim? Well, Your Honor, I think that if he was hospitalized as a result of the treatment that he received by the military, I think that shows persecution. So that's why he would want to show that he was hospitalized. But his testimony, as Judge Wardlaw pointed out a few minutes ago, his testimony and his wife's testimony is very consistent, that he was treated at home. Yes, Your Honor. It's un-you read that and you just come away with it. It's believable. It appears believable that they were treated. He was treated at home for the reasons that we already, the counsel kind of articulated. Yes, Your Honor. So what good does that, what, it confirms that he was, that the doctor provided treatment. I don't, it's kind of true that the doctor provided, but how does the fact that it says that he was hospitalized, how does that enhance his claim, if at all? Well, I believe, as I said, that if he was hospitalized, I think that shows the severity of the beating. As for whether or not his wife's testimony corroborates his testimony, the government would argue that he, that that does not corroborate or that her testimony was not corroborative. And the reason was that she testified inconsistently in other respects, and in particular the question whether or not he could speak after he returned home. Actually, she waffled back and forth on that issue three or four times during her testimony, sometimes saying that he could not speak and he only had to gesture or he could only gesture that he couldn't go to the hospital, and sometimes saying that he told her the very same day that he returned from the beating what had happened to him. So the wife's testimony is not reliable, and I think the immigration judge specifically stated that. So her testimony about him being treated at home does not corroborate his testimony. Did the I.J. find her not credible? The I.J. found all three Petitioners not credible. And, Your Honor, if I may also address the question about the translation. The Petitioners claimed that the document was mistranslated, yet they never came forward with the correct translation. Now, there's a regulation, and that's 8 CFR 1003.33, that requires a written certification of foreign language documents by a competent translator. Was there any attempt to use the interpreter, the court's interpreter there? No, Your Honor. The Petitioners' counsel never asked the court to do that, and, of course, Petitioners have the burden in this case to make out their case. Why wouldn't the I.J. say, okay, there's a discrepancy, and just turn to me. I mean, when I was a district court judge and I had translators, you just go, okay, what is this? Why wouldn't the I.J. say that? Well, Your Honor, I wouldn't want to speculate, but it's entirely possible that the immigration judge let Petitioners' counsel make out their own case. In fact, if the translation was consistent with the original document, that would undermine their claim. So perhaps counsel didn't want to ask that question. I'd also point out that Petitioners' repeat they were twice given the opportunity to correct this problem. The discrepancy, the immigration judge confronted the lead Petitioner with the discrepancy in the first hearing, the first merits hearing, and then there was the case was continued. In that continuance, no effort was made to get a new translation of the document. Even before the board, and I would direct the court to the board. Didn't the asset of the hearing, didn't the government's counsel object to that? To that letter? It's true, Your Honor. The government's counsel didn't want it. Admit it. Well, the government had some concerns about the translation because certain letters did not appear. There were a certain number of lines, I believe, in the original letterhead, and the same number of lines did not appear in the translation. So the government counsel was simply raising concerns about what appeared to be disparities. Now, the government is no more a certified translator than the aliens themselves. And so I think the immigration judge correctly overruled that objection, may have taken it into account in weighing the document, did not say. But I think it was appropriate for the immigration judge to accept the document, notwithstanding the government's basically unsupported objections to the document. And if I may just finish my last point and say that at administrative record, page 30. These cases all blend together, I mean, from yesterday and today. We got more tomorrow, but I'm not sure I have my facts down exactly correct here. But isn't this the case where at the outset of the hearing, the counsel for the petitioner's ass says that she hasn't had a chance to adequately interview her clients because she doesn't speak Armenian? That's correct, Your Honor. And she asked to use the court's interpreter, and the court said no. Yes, Your Honor. That is this case. This is my interpreter, not yours, and you're just stuck. Well, Your Honor, I think that the immigration judge is anxious to maintain the impartiality of the translator. What's impartial about just asking the interpreter? What does this mean? As Judge Wardlaw said, we do that all the time. In district court, you do that all the time. Because we're trying to have the court paid by the court and provided by the court. Because we're trying to have a fair proceeding and get to the truth of the matter, not cut off testimony. The other problem I find with the wife's, and I just want to get your reaction to it because it is a problem, is that a lot of the transcription of the wife's testimony, it says indiscernible, indiscernible repeatedly. So how can, we don't even have a translation, a transcription from which you can read the  How can you really understand what the wife was saying in order to make a determination that she lacked credibility? Well, Your Honor, as far as I know, there were no objections to the record or to the preparation of the transcript. Wait a minute. The transcript is prepared. You know how and when a transcript is prepared. Yes, Your Honor. It's only, how can there be an objection to the transcript? It's only prepared after the notice of appeals filed. That's correct, Your Honor. Because you don't transcribe every, the government doesn't transcribe every single hearing. And the IJ or even the parties don't even get to see this until it gets to the Court of Appeal. And sometimes you delay for months even getting it to us. The transcript is prepared prior to the briefing before the Board of Immigration Appeals. So an objection could be made to the Board and that objection could be preserved. That was not done in this case. As far as the parties are concerned, the transcript is adequate in this case. Well, as far as the Court, me and my wife. Is there any particular area that is? Yes. It's like there's, in the wife's testimony, it's indiscernible. Almost every answer contains a little parenthetical, indiscernible, indiscernible, indiscernible. So for the IJ to base, or, I mean, I don't know. It's very difficult in some of these cases to really understand what the IJ is basing this credibility determination on and you can't even read the transcript, you know, what was really said. Well, Your Honor, I'm not sure if I can address the Court's concern at this point, but all I can say is that it hasn't been raised, the issue hasn't been raised before. If I may, in my last few moments, I would just like to say that regarding the son's asylum claim, the son presents an independent asylum claim. The Court does not have to consider whether or not if the father's son, if the father's son fails, then the son's claim automatically fails. There are independent discrepancies in the son's claim. So I, so let me just get this right. Yes, Your Honor. There's the lead petitioner and then his son has a separate petition, but the wife's is dependent on the husband. That's right, Your Honor. Okay. So I tend to agree with some of the adverse credibility findings as to the son. So do we consider those separately when we're looking at the credibility issues of the husband and wife? Well, Your Honor, I believe that the fact that all three petitioners testified in the proceeding means that the judge's credibility finding with respect to each of them reflects on both applications. Why would that be? Because Armen had an entirely different separate series of events underlying his petition. He wasn't dependent on the same series of events that the father was. They were gone when he got out of the military, right? Yes. They were gone. But the reason that the son was taken in by the military was strictly to get the parents to come back to Armenia. That was the only reason they were going after the son. They were trying to force the parents to return. And so the son's claim actually is completely dependent in a factual sense, not a legal sense. Why were they trying to force the parents to return? Well, I'm not prepared to speak on their behalf, Your Honor, but I would simply say that they were unhappy with the parents, according to the claim, and apparently But you're finding the claim believable. No, Your Honor. You're accepting the story. You're saying the government went after the son because they were trying to get to the parents. That is their theory of the case, Your Honor. I disagree with it. You just answered the question, but that was your response, too. Your Honor, the question was whether or not the son can be considered incredible if the parents are incredible, and I believe that that does follow. If the court rejects the parents' claim, that definitely impacts the credibility of the son's claim. I'm looking at it the other way. I think it works the other way as well. But why? Is there a case on that? Because I've not seen that before when they're separate petitions. All I can say is I'm not aware of a case on that particular point, Your Honor. But I do believe that Did the government waive that argument? No, Your Honor. I think that we've consistently asserted that all of the Petitioners are incredible and that the You haven't cited authority as to how his claim I cited the evidentiary record. I think that legal authority as to how his claim or if he's found to have to, if the average credibility finding with respect to Armand's claim is upheld, how does that affect the other petition if we were to find that the average credibility there is not to be, is not correct or supported by substantial evidence? I can't cite a case on that point, Your Honor. I would simply say that the immigration judge found all three Petitioners credible, incredible after hearing all three testify in court. So I think it is fair to take into account the fact that the father has presented or the son has presented a witness on his behalf, the father, who the court found incredible. I think that follows as a matter of logic, reason, and evidence, though I don't have a case that supports that proposition at this time. Okay. The Court doesn't have any other questions. Yeah. You've gone over your time, too. Thank you very much. Go ahead. Yeah. Thank you. I'll give you an extra minute. Government counsel went over almost four minutes, but it's in part to my question, so. A couple of quick points I would like to make. First, the wife's testimony is not inconsistent, as Your Honor has noted, if you look carefully at pages 245 to 50 of the record, and specifically 249, one of the big problems the I.J. had with the wife's testimony was she stated that her husband was unconscious. But if you read the testimony in its entirety, it shows that they were holding his hand, and he basically walked in bloody when he came in. And then later when she was told, I thought you said he was unconscious, she said, no, I didn't say he was unconscious. He was unconscious when they were beating him, but not when he came home. So there's actually no inconsistency there. Moreover, now, I notice that the Court did have some concerns with the son's application. I'm looking at page 575 of the administrative record. The declaration of the son is actually very terse. But the two sentences at issue say, about a month and a half after returning home from the Army, the police took me to the police station and cruelly beat me and threatened to kill me if my parents did not return. This happened at least four times. The armament, the son's, the son testified at the hearing that he was taken away four times, but that during three of these he was beaten. This is minor. This statement, the sentences I just read are kind of ambiguous, if you put those two in context. It, there's not a lot of detail set forth in the declaration, and the fact that he gives greater details during his testimony, provided that they're not inconsistent, doesn't make, basically this Court has held before a general response to questioning followed by a more specific consistent response to further questioning is not a cogent reason for supporting a negative credibility finding. Here he was just explaining what was in his declaration. He did state that it was at least four times he was taken away, but that he was beaten on three. Here you can read the statement both ways, that it means each of the four times he was beaten, or it could be consistent that maybe this was just a problematic area of his, of the translation in his declaration or something to that effect. Would you respond to the government's argument that you had, there was a break in the proceedings and the petitioners did not come back with a further translation or a correct translation of the doctor's statement? I am not sure why that happened, since I wasn't the counsel below. The only thing I could say, and this is speculation, but I think the judge's decision is based on speculation, so let's speculate the other way, is that this could have been the doctor friend that wrote the letter, and he wrote the letter on hospital letterhead, but it didn't necessarily mean that he was in fact hospitalized in an actual hospital building. Counsel, have you had the letter translated since on appeal? No, Judge. So you don't know what that word says any more than we do? No. No, the record is what it is, and it's basically a mandate. If we thought that something turned on that, your preferred solution would be for us to remand to the district court for further findings? I mean, to the I.J. for further findings? Well, I would hold that, first of all, it's not even an inconsistency that you could Well, I understand. I gave you the premise, if we thought it was a problem. Yes, I would believe it would need further clarification. I believe the Respondents actually have other relief that they may be available for, too, via family petitions. And also another issue is the I.J. never really weighed the Catt claim whatsoever. He basically in one sentence, a very terse sentence, he basically stated that it doesn't count because he's finding them not credible. I would point this Court's attention to Kamalthus. It says that you have to independently weigh the credibility determination. And here that was just simply not done. The judge did never, not once. And the petitions consider the country conditions, which is required by this Court's precedent. Nowhere are country conditions mentioned in the I.J.'s decision. At minimum, this case needs to be remanded for Catt. And given all the other problems that transpired during the hearing, as Your Honors have mentioned throughout the hearing, this man is entitled and should be afforded a new hearing that comports a due process. And during that, I would assure that this document would be translated. It's a little late now since we can't submit the evidence at this stage in appeal. And just finally, at this point, are we to consider all three petitions as one, or are they separate petitions to be independently evaluated? Well, the Hike, who's the main petitioner, the lead petitioner, he filed a Form I-589 and his wife is a derivative because they're still married. The son aged out, so he was required to file an independent I-589. The claims are interconnected. However, the son's physical abuse is based upon what happened to him after he returned from the Army, because he wasn't physically present in the country when it happened. Now, I would like for them to be joined, since it is a family, and I don't believe that the inconsistency that is attributed to the son is actually an inconsistency. I think it's just an explanation of what is actually set forth in his declaration. But the cases should be held together one way or another. All right. And you say there's other avenues of relief that might be available? From what I've looked at in the file, it appears that somebody can petition for them for an immigrant visa. Is that their daughter who's here in the United States and not? Correct. She's a U.S. citizen now. And I have a naturalization certificate and basically some completed forms. Whether they've been filed yet, I don't know. They're dated in November of this year. But it's relief that has recently become available. Okay. Thank you. Thank you. Does anybody have any further questions? Okay. Thank you very much, Counsel. Thank you. Avazian v. Gonzalez is submitted, and we'll take up Chaua v. Gonzalez.
judges: Wardlaw, Paez, Bybee